```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
_____
                              )
UNITED STATES OF AMERICA,     )
                              )
     Plaintiff,               )
                              )
     v.                       )    CRIMINAL NO. 04CR10332-RCL
                              )
JOSEPH MATZ,                  )
                              )
     Defendant.               )
_____)
```

### **DEFENDANT'S SENTENCING MEMORANDUM**

#### **Introduction**

Defendant Joseph Matz (hereinafter "defendant" or "Joseph") is charged in a one count indictment, returned on November 3, 2004, with the robbery of $2,710 from the 175 Federal Street branch of BankBoston in Boston on November 12, 1999, in violation of 18 U.S.C. §2113(a).  On August 17, 2005, the Court ordered the preparation of a pre-plea Presentence Report, and on March 6, 2006, the Court scheduled a change of plea hearing and sentencing for April 20, 2006.  Defendant filed his objections, comments and additions to the Presentence Report on March 20, 2006, and a revised Presentence was completed and disclosed to him on April 11, 2006.  For the reasons set forth below, defendant submits that a sentence that does not require him to serve additional time after the completion of the Connecticut sentence he is now serving will be "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C.

§3553(a)(2).

**A. <u>The History and Characteristics of the Defendant</u>.**

Joseph is a 36 year old African-American man who was born in Pittsfield, Massachusetts, and, after being adopted as an infant, grew up in western Massachusetts, Belmont and Brookline with his white, middle-class, adoptive family. His family was relatively well off, and all of his basis needs were met. (PSR, ¶¶55-57) The separation and divorce of Joseph's adoptive parents in 1977, when he was eight years old, was difficult for him, and thereafter he alternated living with his mother and father. After his father remarried when he was 15 years old, he did not get along with his stepmother, and had to go live with his adoptive mother at the age of 16 because of problems in the home. (PSR, ¶58).

The major determinant in Joseph's life since his childhood has been an overwhelming drug addiction compounded by learning disabilities and bouts of depression and mental illness. (PSR, ¶¶72-74, 87)  Joseph's problems with substance abuse began at age 12, when he began to use alcohol and marijuana with his brother and friends.  During high school, he drank regularly and smoked marijuana on a daily basis during and after school. (PSR, ¶¶78-79)  He first used cocaine during this time, and began smoking crack regularly in 1987 at the age of 16.  According to Joseph, his cocaine use quickly became an addiction and "controlled his

life," such that he "lived to use." (PSR, ¶80) His compulsion to support his drug habit led to a life of increasingly serious crimes, and an adult life spent primarily behind bars.  Indeed, in the period from 1987 to the beginning of his present incarceration in November, 1999, Joseph's longest period of sobriety was for 10 months in 1992, after he completed a 90 day substance abuse program. (PSR, ¶80)

   Joseph's first brush with the law was in 1986 when, at the age of 16, he was adjudicated delinquent and given a suspended commitment to DYS for uttering forged instruments and breaking and entering. (PSR, ¶¶30-31)  He was convicted of shoplifting and sentenced to 20 hours of community service at the age of 17. (PSR, ¶31a)  Clearly driven by the irresistible nature of his addiction, Joseph was convicted of a series of breaking and entering charges which resulted in periods of incarceration separated by relatively briefs periods on parole and probation from February, 1988, at the age of 18, until April, 1999, when he was 29. (PSR, ¶¶32-36)  During the periods that he was not incarcerated, he attempted to overcome his addiction by participating in substance abuse programs in Stoughton when he was still a juvenile (Straight, Inc.), in Springfield in 1988, 1992, 1994, 1998 and 1999 (Marathon House and Ethos).  He completed a 90 day in-patient program at the Salvation Army in 1992, and was able to remain drug-free for 10 months thereafter.

However, Joseph did not complete most of these programs, he began using drugs again, and he was returned to prison for violating his probation or parole. (PSR, ¶32) The only violent crime of which Joseph was convicted prior to 1999 was for assault and battery on correction officers, which arose out of an incident at MCI-Shirley in 1995 for which he was sentenced to 30 days.[1] (PSR, ¶38) However, Joseph is reported to have had a poor adjustment during his incarceration from 1989 to 1997, with numerous disciplinary reports, parole failures and returns to higher custody. (PSR, ¶32)

    Joseph obtained his GED in October, 1988, while incarcerated at the Norfolk House of Correction.  During the period from 1989 to 1999, Joseph was employed sporadically for several months at a time while he was not incarcerated. (¶PSR, ¶¶92-95)  He also had several relationships with women, the longest lasting from 1992 to 1997. (PSR, ¶64).  Joseph apparently fathered a daughter with a woman with whom he was living prior to the beginning of his current incarceration in 1999.  The child, who is now 6 years old, was adopted and living with her adoptive parents in Springfield.  Although Joseph has never seen his daughter, he has maintained contact with her adoptive parents. (PSR, ¶65)

---

    [1]/ Joseph maintains that these charges were brought against him only after he accused the officers of assaulting him, and that he admitted to sufficient facts to avoid the risk of a conviction and much greater sentence if he had gone to trial. (PSR Addendum, Objection #2)

Joseph was arrested on November 29, 1999, for the robbery of a Springfield branch of a Bank of Boston that occurred on November 5, 1999. While awaiting trial, he was evaluated at the Bridgewater State Hospital for competency to stand trial. He was found competent and diagnosed with depressive disorder, not otherwise specified, and polysubstance dependence.[2] He was convicted of this offense in Hampden Superior Court on October 13, 2000, and sentenced to a term of 3-4 years in state prison. During this incarceration, he attended AA/NA meetings, mental health counseling, life skills programs and he took pre-college classes. (PSR, ¶¶42, 83)

On April 2, 2001, Joseph was convicted of the robbery of a Fleet Bank branch in Hartford, Connecticut, that occurred on November 18, 1999, approximately two weeks after the Springfield robbery. He was sentenced to a term of 10 years imprisonment consecutive to the 3-4 year Massachusetts sentence, with 5 years to be served and 5 years suspended with probation. Joseph was released from his Massachusetts sentence and began serving his Connecticut sentence on September 10, 2003. After his transfer to Connecticut, Joseph was diagnosed with major depressive disorder, which was stabilized on medication. He meets bi-weekly for mental health counseling, and he has completed the Commitment

---

[2]/ He was prescribed anti-depressant and anti-psychotic medication. (PSR, ¶74)

to Change program. (PSR, ¶73)  He also has been furthering his education with correspondence courses.  He is scheduled to be released on May 13, 2008, at which time he will begin his 5 year probationary term. (PSR, ¶43)

Joseph had been hoping to participate in the Delancy Program in New York City upon release from his Connecticut sentence in May, 2008.  This is a residential program that requires a two-year commitment from residents who must work in local businesses to pay the costs of the program.  It is designed for repeat offenders and seeks to break the cycle of substance abuse and crime by having them actively work to change their lifestyle. (PSR, ¶84) According to Joseph's father, David Matz: "As [Joseph] has gotten older he has become increasingly reflective about his vulnerabilities and about what he needs to protect himself from the attraction of drugs. . . Joe has come a long way in jail, in thinking about himself, in reading and studying, and in imagining his future.  The transition back to life on the outside will of course by difficult, but a longer stay in jail runs the big risk of making him yet more institutionalized."  Letter to Court, dated March 8, 2006, attached hereto as Exhibit A.  Mr. Matz believes that the structured setting of the Delancy program will provide Joseph with the skills he needs to survive outside of a prison setting. (PSR, ¶69)

### B. The Nature and Circumstances of the Offense.

The instant offense occurred on November 12, 1999, when Joseph entered the BankBoston branch at 175 Federal Street, Boston, and handed the teller a note in which he threatened to shoot her if she did not give him $2000 in big bills immediately. After being given $2710, Joseph fled. (PSR, ¶8) This robbery occurred one week after the Springfield robbery in which Joseph stole $2150 from a BankBoston branch, and one week before the Hartford robbery in which he stole $1500 from a Fleet Bank branch, in both of which he used essentially the same modus operandi. (PSR, ¶¶42, 43) Although his notes threatened the tellers with shooting, he was not in fact in possession of a gun during any of the robberies. During the three week period that he committed these three bank robberies, Joseph was high on cocaine, not sleeping, and deeply in debt. The robberies were committed out of desperation, with no thought given to the inevitability of his apprehension.[3]

The government was clearly aware of Joseph's involvement in the instant offense shortly after his arrest by a joint federal-state bank robbery task force. The FBI Laboratory received the

---

[3]/ Joseph was arrested for the November 5, 1999, Springfield robbery because he had taken a cab from where he was living to the bank, had the cab wait, and then drop him off at the bus station. Police were quickly able to identify him from photographs and fingerprints, leading to his arrest in New York City at the end of November. (PSR, ¶42)

withdrawal slip on which Joseph had written the note demanding money as early as December 1, 1999, and had identified the latent prints found on it as Joseph's in reports dated January 6, 2000, and November 22, 2000. (PSR Addendum, Objection #1) While Joseph was convicted of the Springfield and Hartford robberies as a result of separate state court prosecutions in 2000, the government did not charge Joseph with the Boston robbery until November 3, 2004, just eight days before the expiration of the five-year statute of limitations. (Id.) Although Joseph sought discovery relating to the reasons for the lengthy pre-indictment delay, the government objected and the Magistrate Judge denied the discovery. See Order, dated June 16, 2005.

### C. The Advisory Guideline Calculations.

#### 1. Offense Level

Defendant agrees with the Probation Office's computation of the offense level for the instant offense pursuant to Guideline §2B3.1 as 24, with a three-level reduction for acceptance of responsibility pursuant to §3E1.1(a) and (b) to a total offense level of 21. (PSR, ¶¶15-25)

#### 2. Criminal History

Although defendant disagrees with the Probation Office's counting of one prior conviction for shoplifting (see PSR Addendum, Objection #3), he agrees that he has more than 13 criminal history points which establish a criminal history

8

category of VI. (PSR, ¶47) In addition, as set forth in subsection C.3, below, as a career offender, defendant's criminal history category is VI pursuant to §4B1.1. (PSR, ¶48)

### 3. Career Offender

Since defendant was over eighteen years old a the time of the instant offense, the instant offense is a violent felony, and defendant had previously been convicted of two prior violent felonies (see PSR, ¶¶32, 38), defendant is a career offender pursuant to §4B1.1. (PSR, ¶26) Accordingly, pursuant to §4C1.1(b)(C), his offense level is 32, reduced by three-levels for acceptance of responsibility to 29. (PSR, ¶¶27, 28)

### 4. Sentencing Range

Based upon a total offense level of 29 and a criminal history category of VI, the Guideline imprisonment range is 151-188 months. (PSR, ¶108) This sentence may be imposed concurrently with the undischarged term of defendant's Connecticut sentence which expires on May 13, 2006, pursuant to Guideline §5G1.3(c) in order to achieve a reasonable punishment for the instant offense. (PSR, ¶109)

### D. A Downward Departure is Warranted.

#### 1. Defendant's Treatment as a Career Offender Significantly Over-Represents the Seriousness of his Criminal History.

A downward departure is warranted pursuant to §4A1.3 because defendant's treatment as a career offender "significantly over-

9

represents the seriousness" of his criminal history.  This is so because defendant's career offender status is based on an attempted breaking and entering offense that occurred almost 19 years ago in 1987, for which he was initially sentenced to probation, and an assault and battery on correction officers that occurred almost 12 years ago, for which he was sentenced to 30 days.  These offenses are both trivial and remote, and lack all but a technical element of violence.  The attempted breaking and entering offense qualifies as career offender predicate only because the indictment alleges that defendant entered a "building," and the assault and battery charge was, according to defendant, to cover-up his complaint that he had been assaulted by correction officers.

Apart from the two bank robberies that occurred at approximately the same time as the instant offense and are not career offender predicates because defendant was convicted of them after the commission of the instant offense, virtually all of defendant's prior offenses were for non-violent property crimes that were clearly committed in order to support his drug addiction.  See United States v. Lacy, 99 F.Supp.2d 108, 119 (D. Mass. 2000)(departing from a career offender Category VI to a Category III where defendant's record was "largely non-violent and relatively minor, the kind that characterizes an out-of-control addict.")  As in United States v. Leviner, 31 F.Supp.2d

23, 34 (D. Mass. 1998), where the court departed downward from a Category V to a Category III, defendant's succession of non-violent offenses "suggest someone whose drug problems had never been addressed in the past and thus he continued to re-offend." It would be inconsistent with the Guidelines' purpose of assessing culpability and predicting the likelihood of recidivism to put defendant in the category of the most serious offender who presents the greatest threat to society.  Particularly where, as in the present case, it appears that defendant has been drug-free for the over six years that he has been incarcerated and he is committed to treatment for his addiction, "the court may conclude that counting the offenses committed while suffering the effects of addiction . . . results in an overstatement of the seriousness of his criminal history or the likelihood that he will repeat his crimes."  United States v. Hammond, 240 F.Supp.2d 872, 878 (E.D. Wis. 2003).

> **2. A Downward Departure is Appropriate to Ensure that Defendant's Punishment is not Increased Unduly by the Fortuity and Timing of Separate Prosecutions and Sentencings.**

In the present case, defendant committed three bank robberies, of which the instant offense was one, over the course of three weeks in November, 1999.  His arrest on November 29, 1999, led to his prosecutions in Massachusetts and Connecticut in 2000, and prison sentences of 3-4 years in Massachusetts followed by 5 years in Connecticut.  As a result, defendant will have been

11

continuously incarcerated since his arrest until his release from the committed portion of his Connecticut sentence on May 13, 2008, for a total of over 101 months.

If defendant had been prosecuted federally for the three bank robberies in 2000, when the government was aware that he had committed them, his Guideline sentencing range as a career offender would have been the same then as it is today, 151-188 months.  If a 151 month sentence had been imposed, defendant would have had to serve, with 15% credit for good time, a total of approximately 128 months, 27 months longer than the time he will have served when he is released from his Connecticut sentence in May, 2008.  On the other hand, if defendant had been prosecuted and convicted for the instant offense at the same time that he was prosecuted and convicted for the Springfield and Hartford robberies, it is likely that his federal sentence would have been imposed concurrently with the state sentences and he would have had to serve no more than an additional 27 months or so after his discharge from the Connecticut sentence.

As a result of the government's unexplained delay of almost 5 years in indicting him, defendant now faces the prospect of having to serve an additional 151 months after his release from his state sentence or, if the federal sentence is imposed to run concurrently with the undischarged term of his Connecticut sentence, an additional 126 months.

12

This is fundamentally unfair, and warrants a downward departure pursuant to §5G1.3(c) "to ensure that the combined punishment is not increased unduly by the fortuity and timing of separate prosecutions and sentencings." U.S.S.G. §5G1.3(c), Application Note 3(E).  A district court is free to consider as a basis for a downward departure a "fortuitous delay" in an indictment "that prevents a defendant from serving part of his federal sentence concurrently with his state sentence . . ." United States v. Defterios, 343 F.3d 1020, 1023 (9th Cir. 2003). See United States v. Sanchez-Rodriquez, 161 F.3d 556, 564 (9th Cir. 1998)(en banc)(District court did not abuse its discretion in departing downward "for the lost opportunity to serve state and federal time concurrently."); United States v. Otto, 176 F.3d 416, 418 (8th Cir. 1999)(District court has the authority to depart downward in order to give the defendant credit for time served on an expired state sentence.)

Defendant suggests that it would be appropriate for this Court to depart downward so as to effectively give defendant credit for all of the almost 77 months he has served since November 29, 1999, to date on the Massachusetts and Connecticut sentences.  A sentence of 60 months which was imposed to run concurrently with the 24 month undischarged term of defendant's Connecticut sentence would require defendant to serve an

additional 27 months after his release from state custody.[4] In this way, the total period that defendant will have served on the state and federal convictions will be roughly the same as the period he would have served if he had been timely prosecuted on the federal charge and given concurrent time. Such a sentence would also serve "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). By granting the proposed downward departure, the Court will avoid the disparity between the combined state and federal time that defendant will serve and the time a similarly situated career offender would serve had the prosecution been timely commenced.

### E. This Court Should Impose a Non-Guideline Sentence That Does Not Require Defendant to Serve Additional Time After His Release From State Custody.

Defendant urges the Court to impose a sentence of no more than 28.5 months, to run concurrent with the undischarged term of defendant's Connecticut sentence, with a three-year term of supervised release. This sentence will allow defendant to be released from custody at the end of the committed portion of his Connecticut sentence. At that time, he will be subject to a term of 5 years of Connecticut probation which, if revoked would require defendant to serve an additional 5 years. He would also

---

[4]/ This assumes that, with 15% credit for good time, defendant is likely to serve 51 months on a 60 month sentence.

be subject to the period of supervised release on the federal sentence.  Such a sentence would be sufficient, but not greater than necessary, to comply with the following purposes of sentencing as set forth in 18 U.S.C. §3553(a)(2)(A)-(D).

### 1. **The Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment**.

By sentencing defendant to a term that would not require him serve additional time after his release from state custody, the Court would be recognizing the fact that the 101 months that defendant will have served for three bank robberies, including the instant offense, reflects the seriousness of the offenses while at the same time taking into account the circumstances of the drug addiction that precipitated them.  The pendency of the federal prosecution since November of 2004 has made defendant's state incarceration far more onerous by preventing him from being transferred to lower custody where he would have been able to participate in educational and other programs, and a concurrent federal sentence would deprive him of the opportunity to be paroled in August, 2007, effectively adding almost 10 months of incarceration. (PSR, ¶43) This lengthy period of incarceration provides just punishment for the offenses, without undermining the progress defendant has made toward rehabilitation.

### 2. **The Sentence Protects the Public from Further Crimes of the Defendant**.

Defendant has been drug-free for over six years, during

which time he has participated regularly in drug treatment programs and mental health counseling.  By the time he is released from state custody he will have been drug-free for over eight years and will have two more years of treatment and counseling.  This lengthy period of incarceration would be followed by a suspended 5 year Connecticut prison sentence and probation, as well as a 3 year federal term of supervised release.  Both the probation and the supervised release will require defendant to participate in continued drug treatment and mental health counseling.

    Joseph realizes that his drug addiction is a problem that has no cure and will require a life-long commitment to sobriety.  He has gotten to the point in life where, with greater maturity and self-awareness, he realizes that unless he breaks the cycle of drugs and crime he will be spend the rest of his life in prison.  It is for that reason that he is hoping to participate in the Delancy program which his research indicates has a low rate of recidivism as compared to other programs. (PSR, ¶43) If participation in this two-year residential program is made a condition of probation or supervised release, it would provide another level of assurance that he will not relapse and reoffend.

    At this point in Joseph's life, the public will be best protected if his addiction can be successfully treated and controlled.  Additional incarceration will not serve this goal.

On the contrary, it can only undermine the efforts he has made thus far, and discourage him from continuing to progress toward becoming a constructive member of the community.  Once he has been released, community supervision and the threat of a return to custody will provide adequate and effective protection of the public.

**3. The Sentence Will Provide Defendant With Effective Correctional Treatment.**

Under the proposed sentence, defendant would continue in state custody for the remainder of his Connecticut sentence, during which he would continue in the drug treatment and mental health programs in which he is now participating.  After his release, as a condition of probation and supervised release, he would benefit from programs available in the community and support from state and federal probation departments and from his family.  See Letter from Lee Dushoff, attached hereto as Exhibit B.

### Conclusion

For the foregoing reason, defendant requests that this Court impose a non-Guideline sentence of 28.5 months that is concurrent with the undischarged term of his Connecticut sentence and would permit him to be released from state and federal custody at the conclusion of his Connecticut sentence.  Alternatively, defendant requests that the Court either grant a downward departure or impose a non-Guideline sentence of no more than 60 months to run

concurrently with the undischarged term of the Connecticut sentence so that his combined state and federal punishment would be the same as it would have been if he had been indicted and prosecuted for all three bank robberies at the same time.  In the event the sentence the Court imposes requires the service of additional time in federal custody, defendant requests that the Court recommend that defendant participate in the 500 hour intensive Bureau of Prisons drug treatment program and that he be incarcerated in an institution as close to Boston as possible.

JOSEPH MATZ,
By his Attorney,

/s/ *Jonathan Shapiro*
Jonathan Shapiro
BBO No. 454220
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
617-742-5800

Dated: April 18, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s)
filed through ECF system will be sent
electronically to the registered participants
as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those
indicated as non registered participants on 4/18/06 .

/s/ *Jonathan Shapiro*